Good morning, Your Honors, Counsel, and may it please the Court. My name is Michael Gomez from the Office of the Federal Public Defender, appearing on behalf of my client, Mr. Jordan Holt. Your Honors, there were three primary errors that denied Mr. Holt a fair trial in this case, and with the Court's permission today, I'd like to focus on the erroneous admission of Agent Knight's purported expert testimony, and if there's time permitting, the prosecutor's misstatement of law and rebuttal, though I'd be happy to answer Your Honors' questions about any of the arguments. Well, let me intrude, then, and focus for a quick question about the sentencing and your substantive reasonableness argument. One issue that I saw with that argument is, or one concern I have about the issue generally, is that the opening brief appears to use the words, variance and departure, sometimes interchangeably. The district court purported to do an upward departure, five levels up, and in the district court, the counsel used occasionally the words variance and departure interchangeably. What concerns me about that is they are distinct mechanisms, and they have distinct approaches in determining whether there was error or not, and so what I'm struggling to understand is what should I do with that now, because as far as I could tell, both you and opposing counsel argue this as if it is a variance, when it was not that. Yes, Your Honor, and I apologize for that confusion. Yes, this was a departure. It increased the guidelines range from what was originally calculated, and I think the court's focus on the circumstances of the offense, which was what led to this extreme upward departure, that was an error, the focus on just those circumstances of the offense, but I think what's important to note here is the court gave absolutely no weight to the mitigation. So, counsel, just to reframe this, tell me if this is a reasonable way to understand your substantive reasonableness argument. There was no objection to the departure itself, right? Correct, Your Honor. Okay, so once the departure is applied, it increases the guideline range to 151 to 188, and your client was sentenced at 180, right? Correct. Okay, so is your substantive reasonableness challenge focused on the length of the sentence in the newly calculated range? Yes, the substantive reasonableness argument is the length of the sentence in that newly calculated range. So we don't really have to think about the departure. Correct, Your Honor, and the court sentenced Mr. Holt to the statutory maximum of 180 months. That's where the 180 came from, and again, the rest of our arguments do hold up the same, that there was no weight given to the mitigation, and there was undeniable mitigation in this case, which the court, after a pronouncing sentence, did discuss, but it wasn't factored into the sentence that was imposed. Let me make sure I understand the colloquy. As I understand it in the district court, you did object to whether there should be a departure or not. There was no conceding that an upward departure was appropriate, right? Well, yes, Your Honor. The defense counsel asked for the low end of the initial guidelines calculation. Well, that's a big difference from a five-level upward departure, right? Yes, Your Honor. Or any upward departure. Okay, so let's, on appeal, are you contesting the fact of departure? That was not the claim that we've raised. We've raised the substance of reasonableness, the length of the sentence, based on what the court was operating under, and in this case, the court was operating under that departure, that upward departure, and it's the length of that sentence that we are contesting. Well, it is the length of the sentence, but when you, but the point would be where within the upward, well, as I understood your colloquy with Judge Rossman, what you're contesting then is the how high within the range set by the five-level upward departure, right? Correct. Well, that still doesn't deal with the question of the fact that upward departures, they just have a different, they're a different way of doing them. I mean, their focus is not on 3553A. Their focus is on other stuff, and the argument here is all, you know, you focused on one factor, not other factors. There are cases that we have that talk about that, but they're variance cases. They're not upward departure cases. Yes, Your Honor, and to the extent that this court, that the court accepts the upward departure, we're operating under that higher guideline range, the substance of reasonableness argument still stands, and that's the claim that we have, yes. And so as I understand you then, what you're saying is that where we stand now, what you're talking about is the application of the 3553A factors to the fact of upward departure. Yes, Your Honor. Okay. Yes. All right, go ahead. I apologize for that confusion, but I'd like to bring us back to something before sentencing, which were the trial errors that denied Mr. Holt a fair trial, and in this case, as I said, I'd like to start with Agent Knight's purported expert testimony. Agent Knight was qualified to provide testimony on bullet defects, on measurements and trajectories, but his expertise stopped before any of the 40 or so bullets fired that day hit Mr. Scales's head. And this was a chaotic scene that unfolded in seconds. As I mentioned, there were at least 40 bullets fired, evidence of 40 bullets fired, including... Counsel, what is your specific challenge here? And if you could focus specifically on your reasons for your pretrial challenge tonight. Yes. So there are a couple of challenges. So one, it's the court, the district court's abdication of its gatekeeper function, specifically with regard to the analysis of whether the methodology was reliable. Because there, as the court noted in its order, much of the government's response, and I quote, much of the government's response summarizes Agent Knight's report rather than describing his methodology, which does not provide the court much in regards to the daughter factor. So there was no methodology. What is your position on the law here? Right? So at the pretrial stage, the district court has a gatekeeping function, which includes assessing the methodology. Yes. Do we require the court to make specific findings on methodology to satisfy the reliability requirements of Rule 702? Yes, Your Honor. And I don't have the case citation directly with me, but when there is this challenge, when defense counsel does pose this challenge, requiring the district court to engage in this type of gatekeeping function, the court is required to give specific findings of not only qualification, but the methodology and the reliability of the methodology. And here we have one where the court didn't review methodology because none was given. So that was the abdication of the role. So the district court said that it, and it cited Kumho-Tyre, that trial judges have leeway in deciding in certain cases how to assess methodology. Do you agree that that's so? Yes. So why isn't that, as applied here, a fair way to understand what the district court was doing in the totality? In other words, you know, the motion was before the court. It was assessing Agent Knight's methodology by reference to the report or the analysis that was submitted. You, the defense, also had an expert that was coming in. You were going to be able to cross-examine Knight's methodology in trial. So why can't we say that the district court properly invoked its authority, discretion, and exercised its decision that under these circumstances, this was enough to make the methodology finding? Okay. A couple of points to that, Your Honor. And first, I'd like to start with the district court's finding, as much as we could call it one, where it found, in an order, the court said, OSBI is one of the main investigative bureaus in Oklahoma. Agent Knight has numerous qualifications. This is sufficient for the court to conclude that the anticipated testimony has sufficient indicia of reliability. That has nothing to do with, that does not represent or reflect this analysis or leeway that shows that there was no methodology to review. And the fact that the Oklahoma State Bureau of Investigation is a reputable organization doesn't mean that the methodology was reliable in this case, excuse me, or reliably applied. And the second part of that, Agent Knight has numerous qualifications, goes back to the first prompt of the Dauber factors, which is whether he was qualified in this area to begin with, and he wasn't. And we know that, again, referencing the district court's order. The court didn't say he had expertise in this area, which I'm calling forensic pathology, but the physiological effects of a bullet entering a human body. The court instead said, presumably, reconstructing a bullet trajectory involves some analysis of the physiological evidence left by that bullet. The presumption is not based on anything in the record, because his qualifications, they were generic crime scene. But he wasn't offered as a forensic pathologist. Correct, Your Honor, he wasn't. So the assessment of his qualifications and methodology was attendant to what the government offered him for, which was he was a crime scene reconstruction expert, right? Correct, and that's the only expert testimony he could give. However, the testimony at issue here was that physiological effect of the bullet entering a human body, which was at the crux of the causation element of this case. And I'm referring to specifically pages 1708 to 1710 of the record, where Agent Knight describes the forehead defect as roughly circular, it wasn't a round defect with a uniform abrasion ring, then continues to describe abrasion rings and what happens when a bullet enters skin and a flat bone, even though this was a curved skull. So we have this testimony, and it's the only testimony, this is a multi-day trial, many witnesses, it's the only testimony that speaks directly to the causation element in this case. And is that why you contend it isn't harmless? Correct, Your Honor. So you cited a beyond a reasonable doubt standard in your brief as the applicable standard for harmlessness, but this is non-constitutional evidentiary error, right? So that's not right? Correct, Your Honor. So what is our standard for harmlessness review of the error here? I would say the likely effect that it had on the jury's verdict. Okay, so if we spot you the pretrial Daubert error, you had an expert, you had a defense counsel, cross-examined Agent Knight, why on the basis of the totality here wouldn't we say that this was harmless error under the correct standard? Well, first, Your Honor, cross-examination and the ability to call your own witnesses is not a substitute for district court error, especially an error such as this when it's expert testimony on such a crucial element, one of the essential elements in the case. But again, as you said, this was the foundation of not only Agent Knight's testimony, but the government's theory of the case. It was this one, there were 40 bullets that were fired, evidence of 40 bullets, may have been more. There were at least three to four 9mm firearms, and it was out of all of those bullets, the government and Agent Knight thought that it was this one particular trajectory, trajectory six, and the end of that trajectory, that last causal link, was the basis of Agent Knight's testimony, not only his testimony, but his entire report. And what was so necessary about that testimony, the physiological testimony, is that it conflicted with Dr. Nieblow's initial conclusion. It was the fact that Agent Knight disagreed with the medical examiner's initial conclusion as to how that, excuse me, that bullet wound appeared. She amended her report. She amended her report after Agent Knight came up with a different idea of how it happened, and the prosecutor and the police called Dr. Nieblow and gave her their theory of the case, which was the theory of the case presented at trial, and asked her to reconsider those findings. Importantly, though, Dr. Nieblow stated at trial that her initial conclusion was still a possibility. So it's not that she amended it and came up with a completely different conclusion that ruled out the first. The first conclusion was still a possibility. Well, what does that get you? I mean, it's still a possibility, so what? I mean, as I understand it from Judge Rossman's colloquy with you, we're talking about whether any error, if we assume error anyway, was harmless. I mean, just because it would have been a possibility that there was another way that the injury occurred, that doesn't mean that the way that the agent mentioned could not be accurate, too, right? Correct, Your Honor, but the fact, the error here is that this wasn't just some other evidence that the court let in. This was expert testimony that was unqualified and not reliable that the court let in. So it had, Agent Knight's very crucial testimony had the weight of an expert testimony. And the fact that it carried the day, not only in his testimony, but in the prosecution's theory of the case. Well, you say unqualified testimony. Well, the whole point, I think, that the government can test is that he was not there as a forensic pathologist. They, in fact, had one. They had a forensic pathologist. He was talking about trajectory, and there was evidence that he was qualified to do that. Your Honor, he was an expert in trajectory. He was not an expert in the physiological effects of a human body receiving a bullet. And he testified to the nature of the wound and how that correlated with his view of the trajectory of the bullet. There was somebody who talked about how it impacted him once the bullet was in, right? I see that I'm out of time, but if I can respond to Your Honor's question and clarify something. So he testified to the nature of the wound and how a bullet had to have been spinning in the air or how it had to have been degraded ahead of time in order to hit his head in that particular manner. And he came to that conclusion simply upon reviewing an autopsy photo. It was that. So it's a crucial part because it links to the rest of his trajectory, which he was qualified to testify about. But it was that last piece in that trajectory that was the causation element. We have no idea if that bullet could have gone somewhere else, but the fact that he was able to testify, yes, this is what happens when a bullet, a deformed, even small degraded bullet, hits a person's head at this certain angle. He didn't even testify the angle. It just said, yes, this is what happens. But that is all related to your challenge to the trajectory methods, right? It doesn't invoke the forensic pathology piece of this, right? Your Honor, there is no direct challenge to the trajectory methods themselves. We referenced the fact that they were eyeballing and guesstimates to say that this trajectory was not scientifically or precisely calculated, such that this was a foregone conclusion that the bullet would have ended up hitting Mr. Scales. But the crucial part of this is that this was a necessary component to complete. There are many dots, and this was the last most important dot that Agent Knight was able to complete, that connects for the government, because he testified about what a bullet does to human skin and bone. He testified about paper, plywood, sheet metal, steel. But when he's describing the effect of bullet defects or how bullet defects come about, just generally speaking, he never talked about human flesh or human skin or human bone. Was his testimony cumulative to the testimony that the government introduced regarding the forensic pathologist? No, Your Honor. Well, then, doesn't that suggest that his testimony was discreet from what a forensic pathologist would opine about? To get us away from the technical term forensic pathology and more in terms of human biology, the human physiological effects of receiving a bullet, that's the challenge testimony here. So it's not Dr. Nieblow's testimony of what happened after the bullet fragment went in, was lodged in Mr. Scales' brain. It's where this bullet came from. And we don't know, because the degraded bullet fragment... This is what I don't understand. I'm a little bit more confused now, I must admit. I thought that your challenge was that because Agent Knight's methodology was unreliable, he could not connect the bullet fragment to Holt's gun. Correct. That's your challenge, right? Ultimately, but it focuses on that last part where he was unqualified to testify about, which was the last link in the chain of causation. It went through Mr. Holt's gun and then hit the window of, I believe it was Toyota Sienna, and then it went through a C pillar, and then after that it went into Mr. Scales' head. So all of those pieces, but for the last link, that one particular trajectory, your position is that that's fine? That those methods were reliable? I would say that they were not the most desirable methods, but they were what he did, and we don't have a challenge to say that those were not reliable methods that he employed in that particular... And just so I understand your argument, and the reason why you're challenging that last link is because the ultimate causation conclusion that Agent Knight gave, you say, needed him to have been qualified or able to testify more in the human biology realm. Correct, Your Honor. Did the government's expert, the medical examiner, Niblo, speak to that last piece of the chain? Initially, her initial conclusion was that there was gray soot. She noted gray soot around the bullet entrance wound. So that led her to the conclusion that he was shot at close range by a small caliber handgun. So after Agent Knight saw the photo, disagreed with her interpretation of that bullet wound, which she was the one who examined the body, so he disagreed with her interpretation because it didn't match up with his trajectory that he had. And then he said, well, this looks like it was actually from a high-velocity bullet that had been degraded. So that caused the police and the prosecutor to call Dr. Niblo and ask her to reconsider. But her testament, what did the jury hear? The jury heard about that she'd had this earlier conclusion, and she amended her report. The jury heard that, right? Yes. And then the jury heard her new, revised, updated conclusion. Did the jury hear that? Yes. And what was that conclusion? The conclusion that it was also consistent with a high-velocity bullet that had degraded or had, yes, degraded along the trajectory. Which, in other words, means it came from your client's gun. Correct, Your Honor. Or not that it came from my client's gun, because she couldn't testify to any trajectory before that. She could only testify about the small bullet fragment she found in his brain. And then connecting that to the type of firearm. Well, she couldn't connect it to the type of firearm either. Actually, no expert could connect this small degraded bullet fragment to any firearm. Because it was untraceable. So it could have been the AK-47, it could have been a revolver, it could have been one of the three to four 9mm firearms. And Mr. Holt's expert testified that based on Mr. Scales' possible movement throughout the events, he could have been shot in any position. So not necessarily this trajectory. So Agent Knight's testimony was the critical link. Dr. Newblood did not testify to anything about the source of the bullet, where it came from. And it was Agent Knight who connected those dots with unqualified and unreliable testimony about the human biology aspect of it. There were a number of bullets or bullet fragments found in addition to hit those from his gun. Yes, Your Honor. And were any of those found, like, directionally near the victim? Yes, Your Honor. There were several cartridge casings that were traced back to 9mm firearms, though there were no other firearms to determine which exactly they were. But they were in the vicinity, I believe to the sidewalk just north of where Mr. Scales landed. And in Mr. Scales' general vicinity as well. If there are no further questions, thank you, Your Honors. May it please the Court, William Glasser for the United States. If I could, as the Court did, just briefly start with sentencing. We understood the defense argument here to be strictly a substantive reasonableness argument and not a procedural reasonableness challenge to the upward departure that the district court made. You can certainly challenge a post- I don't think he's saying that. I'm sorry, Your Honor. I don't think that the appellant is contending there's a procedural reasonableness argument here. That's correct, Your Honor. And so we understood this just to be solely a substantive reasonableness challenge to the post-departure sentence. And so that's why we argued this simply as a substantive reasonableness question. I guess one thing that I would note that I omitted to point out in my brief is that this Court would apply a presumption of reasonableness to a within guidelines sentence. Post-departure? Post-departure, yes, Your Honor. What case says that? Your Honor, I'm sorry. I don't recall the name of the case, but this Court has said that. And you're talking about specifically applying the presumption of reasonableness in the post-departure context. That's correct, Your Honor. But I think even regardless of whether we have a presumption of reasonableness or not, the defense hasn't shown that the sentence here, a 15-year sentence for voluntary manslaughter that the district court pointed out, was extreme conduct. We don't think there's any way that that could be substantively unreasonable. I won't pursue this too long. But particularly since we don't see a lot of departures these days, but I recall the old days. In the old days, not only is there the question of doing a departure, but then there's the question of how high do you go? And that correlates with the question of length of sentence. And in determining how high you go, the district court was called upon to look for analogies within the guidelines and to say, this is more like this, and therefore I compare it. And that's how I go about determining what the sentence will be. That whole process is a process that has not been talked about in the briefs here. Correct, Your Honor, because we understand that there's no challenge to the procedural reasonableness of granting the upward departure. And it's not just granting the upward departure. One's talking about what length of departure you're going to do.  That's right, Your Honor. And I think perhaps this is just the world that we live in now, post-Booker and post-Gaul, is that most of the focus tends to be on the 3553A factors. And there aren't sort of those clear rules anymore as to whether or not a departure is appropriate or whether you ought to depart one level, two level, three level, et cetera. Well, that's true, which is why I wondered why. I mean, you know, the court can do what it wants, but the government is the one that sought the upward departure to begin with. That's correct, Your Honor. As opposed to seeking an upward variance, which put us in this world that we're dealing with now, right? Yes, Your Honor. So I think it was certainly permissible for us under the guidelines to seek that upward departure. And although the defense did object to that below, they haven't raised that challenge on appeal. And so we're simply defending the substantive reasonableness now. And I'm not saying it was error, but let me suggest, let me understand this. Sure. I take it that based upon the way that this dispute has been framed now, we're essentially in the world of talking about the district court's application of the 3553A factors as we would if this had initially been a variance. I completely agree, Your Honor. Yes. So then if I may turn to the issues with respect to Agent Knight's testimony. I think it's been helpful and clarifying to understand this morning that the defense is not challenging most of Agent Knight's testimony, but only that testimony about the impact of the bullet fragment upon the head of the victim. And I think here the challenge that they're raising is that that was forensic pathology testimony and it was beyond the expertise of Agent Knight. We think that it was within his expertise related to bullet trajectory. But I think the really easy way to resolve this case is to conclude that even if he strayed beyond the bounds of his expertise, all that he did was testify in a manner that was both consistent with and cumulative of Dr. Sharo Neblo's testimony. So Dr. Neblo. So now you're arguing harmlessness now. I think that's the easiest way to resolve this, Your Honor. So let's pause for a moment. Yes. Excuse me. Let's pause for a moment. Yes, Your Honor. You spend a lot of time in your briefing suggesting that we're on plain error review here. You do no longer contend on that. I apologize, Your Honor. That's what I just wanted to clarify. I'm not arguing harmless error. I'm arguing non-prejudicial plain error. Okay. That takes us back to a much more predicate step.  Why in the world would plain error apply here? So, Your Honor, the reason that plain error would apply here is that the district court denied the motion in Limine to exclude Agent Knight's testimony based on the government's representation that Agent Knight would not be providing forensic pathology testimony. The district court denied the motion saying he's qualified to testify about bullet trajectories, et cetera. And so if the defense wanted to argue that he strayed beyond the understanding of his testimony that the district court was relying on, then it was the defense's obligation to raise that argument at trial and say, Judge, we thought that there wasn't going to be testimony about forensic pathology, and this is testimony about forensic pathology. They had that obligation, and having failed to do so, they failed to preserve the argument. But, Judge Rossman, even if you wanted to assume that it was preserved, we think we can still easily win even on harmless error review for the reasons that I was going to. And that is that Dr. Nablow testified, and this is quoting her testimony at pages 1, or excuse me, Volume 1, pages 1484 to 1485. She said about the defect, the injury to the head, I would say it's most consistent with a fragment from a high-velocity bullet. That's why I think it actually made the kind of more irregular entrance wound. That's very similar to the testimony at page 1709, later in the trial, where Agent Knight testified, the fact that the abrasion ring and the margins or the edges of the wound itself were not circular, indicates to me that it wasn't an intact, spin-stabilized bullet that struck scales, but rather a bullet fragment. So, Agent Knight's testimony was consistent with and cumulative of Dr. Nablow's testimony, that this was a bullet fragment rather than an intact bullet, which, as Dr. Nablow testified, an intact bullet would have likely gone through the head. And this here is where I would like to briefly address Mr. Gomez's argument that he, I believe he said that this was the only testimony that speaks to causation, specifically Agent Knight's testimony. We actually had a lot of evidence regarding causation. So we had our tool mark expert, Caitlin Miller, testified that for a bullet to fragment, it must hit an intermediate object. Dr. Nablow also testified that the wound here was most consistent, as I mentioned, with a bullet fragment that had fragmented after hitting something. Dr. Nablow also testified there was no exit wound. Agent Knight testified that the only, and this was not really disputed by the defense experts, Agent Knight testified that the only evidence of bullet fragmentation on the scene was the, where it was possible, was where the bullet hole went through that C pillar of the minivan. And so the government's theory of causation was we have a bullet fragment, we know that that bullet fragment had to have hit something, and the only place where we see something that hit something traveling in the direction of Mr. Scales was the C pillar of the minivan. We also have Agent Knight's testimony that the bullet trajectory six lined up with where Scales was standing. We have his testimony, again, as I mentioned, the only west to east trajectory, so the only thing going the opposite way, was found in the trunk of the Ford LTD. Is there any difference legally in terms of our analysis, if we agree with the appellant that this is preserved and we're analyzing this under the Kodiakus standard of non-constitutional harmlessness, the government didn't argue that standard in your brief. You argued prejudice under plain error. Correct. Is there any difference in terms of how we would look at those inquiries, depending on what our standard of review is? Your Honor, I think the standard review has to be non-constitutional either way, and so the only question is whether it's plain error or harmless error, and so there I think effectively it's the party's burden is the real difference between the third plain error prong and harmless error where it's preserved. So if we find that it is preserved and disagree with the government's plain error argument, what should we do about the fact that the law directs the burden on you? Your Honor, we think we can easily bear that burden for the reasons that I've been arguing here today. So we should take the prejudice argument under the fourth prong of plain error and stick it into the Kodiakus standard for you? Your Honor, I don't think you're doing anything for us. When we make an argument that there isn't prejudice, although I didn't use the term harmlessness because we thought the plain error applied, the same exact arguments would apply, so I don't think you're doing any work for the government there. So you think the same arguments would apply? Absolutely, Your Honor. Yes. And if I could also address the defense's argument regarding Dr. Neblo's initial conclusion that the dark area around the bullet entry wound was caused, she understood that to be caused by soot. So her initial conclusion was that that came from a shot that was within six inches of the victim's head. That's an incredibly close shot. And although it's true that she changed her report based on Agent Knight coming back and saying, I don't think that's consistent with the scene, it really was not just inconsistent with Agent Knight's conclusions. It was really inconsistent with all of the evidence at the scene. Because to have been shot from six inches away and have only a bullet fragment, rather than an intact bullet in the brain, there would have had to have been some other location on the scene that would have allowed for that fragmentation, would have allowed a shot to take place within those six inches between the gun and the victim's head, for there have been some intermediate object to cause fragmentation. And so really, I think, as Dr. Neblo acknowledged in her testimony at trial, that just wasn't the most likely. It was certainly possible, but it wasn't the most likely explanation. And so, again, as she testified. So she just made a mistake? Yes, Your Honor. She made a mistake. Well, I think what she did was she was looking with a little bit too blinded a focus solely at that mark that she understood to be soot. She later said could have been bullet wipe. In other words, the bullet causing discolorization. And so once she had sort of a broader view of what happened at the scene, she said actually this seems more consistent with a fragmented bullet from a high-velocity rifle. Does the government think that if we agree, let's say we agree with you that there is harmless error here, that it would be beneficial to write the opinion in a way that explains how the district court erred at the Daubert stage? Your Honor, I want to make sure I'm understanding the question correctly. I mean, our view is still that there's no Daubert error, but I do think that. Right. So my question is we're going to either assume that there's error and reach harmlessness. Right. But should we say something about the error here? Because it seems like the district court erred in its gatekeeping role by taking the qualifications and using that as the way to assess methodology. So, Your Honor, I'll make the argument now that there was no error. So, again, I think the easiest way to resolve this is even assuming error was harmless or, excuse me, was non-prejudicial plain error. But we don't think the district court erred. And here's the reason why. The Supreme Court made clear in Daubert that although there is a gatekeeping function, ordinarily the way that you go about testing the credibility of expert testimony that is weak is through the process of cross-examination and the introduction of competing experts. Was there a credibility problem here? It seemed like it was a reliability problem focused on insufficient methodology. Sure, Your Honor. Credibility was a poor choice of words. The methodological question is what I was addressing. And the district court pointed out that, look, we don't have, there's not a lot here to explain the methodology that was applied. I would say that beyond the one expert report that was attached to the defense motion, there was already, the defense had already been provided with a prior expert report by Agent Knight where he had, and this was introduced as Government Exhibit, I believe, 100 at trial. This was, this report included some more, not a lot, but some more explanation of his methodology, including. Is that in the record? Your Honor, it's not in the record volume on appeal. But it was an exhibit introduced at trial, and I hope I'm correct in saying that it was Exhibit 100. And that also included all of the measurements that he made at the crime scene. So, again, we recognize that the reports, both of these reports combined, weren't necessarily the traditional expert report that you might find in preparation for testimony in a federal trial where an expert says, you know, here's my background, here are all the methods that I apply, the sources from which I derive those methods, and here's what I concluded in this particular case. These were actually just reports that he prepared well before his testimony at trial, based on his conclusions about the scene. And let me explore that for a question for a second. I mean, in the Kumho-Tyre, doesn't Kumho-Tyre tell us in Garcia that, you know, when you're talking about law enforcement testimony and when you're talking about, you know, use, for example, the drug agent who's testifying about patterns, their presentation of their background and methodology is going to look very different than a Ph.D. in some esoteric area, is it not? I completely agree, Chief Judge Holmes. And I think I'd just make maybe two more points on this. So another point is that Agent Knight explained his methodology more thoroughly at trial. So at trial he explained, you know, ordinarily I would want to use things like rods, I would want to use protractors, I would want to use angle measuring devices. He said, I didn't have those available to me. I see my time has expired, if I might briefly conclude. He said, I didn't do that, but here's what I did. I shined lights through, I looked at these trajectories. So he actually explained his methodology at trial. And the final point I would make is, as I understand the defense's argument, they've effectively conceded that he could testify about all of that trajectory evidence, that they're not raising an objection to that, either as a gatekeeping matter or a methodological matter under Rule 702. And so all they've objected to is this venturing into what they are calling forensic pathology testimony. And so, Judge Rashman, returning to your question, we don't think there was any error here, because that was a continuation of his trajectory testimony. But even if you were to assume some small straying beyond his expertise or methodology there, it would be something that was non-prejudicial and therefore not plain error or harmless. So we'd ask the Court to affirm. Thank you. Thank you. Case is submitted.